(Decided March 1st, 1878.)

FERDINAND KERCHNER *vs.* REBECCA C. KEMPTON.

HUSBAND AND WIFE.

*Mortgages—Sales under decrees passed by consent of parties— Exceptions to ratification of such sales—Mortgage of separate property of feme covert—Agreement for decree for sale of such property must be executed by wife conjointly with her husband—Husband cannot employ counsel to act for and bind his wife, where her separate property is concerned.—Decrees for sale of real estate passed without appearance, or default, or consent or proof under commission, null and void— Answers in Chancery.*

Mr. and Mrs. K. executed to B. a mortgage of a house in Baltimore City, in the usual form. The mortgaged house was the separate property of Mrs. K. This mortgage afterwards gave rise to litigation, and a bill was filed praying, among other things, for a sale of the mortgaged property aforesaid. Sub-

sequently an agreement was entered into between Mr. K. and B. for a settlement of the matters in controversy, and in conformity with this agreement a decree was prepared, and the solicitor for complainant, and Mr. T. who acted as solicitor for both Mr. and Mrs. K., (but without the knowledge or consent of the latter, having been retained for both by Mr. K. alone,) having endorsed thereon their consent, the said decree was passed by the Court.

By the said decree it was provided, among other things, that the said house should be sold by a trustee, and the property was afterwards so sold. To the ratification of the sale thus made, Mrs. K. filed, among others, the following exceptions.

1. That the decree was obtained in the absence of the consent of the exceptant or any one authorized to represent her.

2. That her husband had no authority to represent or act for her in the premises. HELD:

1st. That the decree being passed avowedly upon "the agreement of the parties filed in the case" and "upon the agreement of the respective solicitors of the parties" thereto annexed, the validity of the decree, so far as it affects the appellee, depends entirely upon the authority of the solicitor to enter into such agreement on behalf of the appellee.

2nd. This agreement was obviously designed to operate as an answer, admitting all the allegations of the bill, and consenting to the decree, as far as the parties to the cause were concerned.

3rd. This agreement not being executed by Mrs K., conjointly with her husband, cannot bind her separate estate as such, nor can it bind the appellee, as an answer.

4th. It is not true that in this State a husband may employ counsel to represent his wife, in a litigation in which her separate property is concerned, and that in the absence of fraud or imposition the same counsel may represent both.

5th. If the decree in this case had been passed in a cause between parties "*sui juris*," represented by counsel, and regularly submitted on bill and answer, its legal effect would have been to establish every fact necessary to the passage of the decree; but being passed by agreement of counsel, whose authority to act for one of the defendants is denied, in a cause in which the defendant supposed to be represented is a *feme covert*, and was returned "*non est*," no presumption can arise not warranted by the evidence.

6th. The act of the solicitor, so far as he undertook to represent the appellee, in signing the " agreement for decree" must be considered unauthorized.

7th. In whatever aspect the "agreement" is viewed, whether as a contract. affecting the real estate of the appellees, or as an answer admitting the allegations of the bill and consenting to the sale, it has none of the sanctions. necessary to bind the *feme covert* defendant, as to her separate real estate.

8th. A decree for sale of real estate, passed without appearance of the defendant, or default made, and without consent or proof under a commission, interlocutory or otherwise, must necessarily be null and void.

As a general rule when husband and wife are sued jointly in equity, the *feme covert* answers with her husband, but under special circumstances she may put in a separate answer, but she is presumed to be so far under the dominion of her husband, that she is not bound by her answer made jointly with him.

APPEAL from the Circuit Court of Baltimore City.

Ferdinand Kerchner and Sydney Kempton were partners until the latter part of 1875, when Kerchner filed a bill in the Circuit Court for a dissolution of the firm, and for the appointment of a receiver.

The bill charged that Kempton had withdrawn money from the firm and misappropriated it, having invested some of it in a house and furniture, in his wife's name, and that this had been done to such an extent, that the firm had been rendered unable to pay its debts.

The bill sought to compel Kempton to replace the firm's. money, and to follow that which had been put into the house and furniture, and for that purpose to have the property sold. Kempton and his wife were made defendants to that suit, and both appeared by their solicitor, and answered separately under oath.

When the case reached that condition, negotiations for a settlement were opened between the parties. Both partners wished to acquire the business, which was regarded as valuable.

Kerchner offered to buy out Kempton, and an agreement. to that effect was made December 28th, 1875, by which Kerchner agreed to pay $975 in cash for the assets and

business of the firm, and to idemnify Kempton against its debts. Kerchner had five days within which to perform this contract, and the time was afterwards extended, but he failed to do so.

Subsequently, Kempton undertook to buy out Kerchner on the same terms. *Kempton's proposition was made, the terms agreed upon, and all the papers executed and delivered on the same day, January 15th, 1876. This is an important fact in the case.*

Kerchner's option to buy extended originally five days from December 28th, and was afterwards entended ten days, which would bring it to January 12th, 1876. On the third day afterwards, January 15th, Kempton made his proposition; it was accepted, and all the papers executed.

The agreement provides for the dissolution of the partnership and the sale of its property and business to Kempton, in consideration of $975, to be paid to Kerchner, and of an indemnity to be given him against the debts of the concern.

That indemnity, as well as the payment of $800 of the purchase money, was agreed to be secured by a mortgage upon the house and furniture mentioned in the bill of complaint, and which that bill sought to subject to the claim of Kerchner, to have them sold to restore to the firm the money that was alleged to have been improperly invested in them.

Before the agreement was executed, it was necessary to get the creditors of Kerchner & Kempton to agree to an extension of their claims against the firm, in order to give Kempton time to provide for their payment.

Such an agreement was accordingly prepared and sent to the creditors for signature, before the completion of the agreement between Kerchner and Kempton.

This agreement on the part of the creditors was made in consideration of the agreement of Kempton to give

the mortgage and a bond conditioned to indemnify Kerchner against the debts of Kempton & Kerchner, and thus gave the creditors an immediate and direct interest for a valuable consideration in that mortgage.

The creditors, in consideration of the mortgage, among other things, agreed to extend their claims, and take notes at three, six, nine and twelve months, ·without interest.

By the terms of the agreement between Kerchner and Kempton, Kempton agreed to hold all the assets thereby conveyed to him in trust for the indemnity of Kerchner, and to apply the same and all reinvestments thereof to the payment of the debts of Kempton & Kerchner, and to afford Kerchner full opportunity to see that this stipulation was faithfully performed.

It was made a condition of the agreement of the creditors that one of their number should also be permitted to see that the assets of Kempton & Kerchner were being faithfully administered.

While the signatures of the creditors were being obtained to the agreement for the extension of time, as aforesaid, Kempton took the mortgage to have it executed by his wife. He returned with it executed about an hour afterwards, and all things being then ready, the arrangement was completed and the papers duly delivered.

Upon the consummation of the agreement, the bill of complaint was dismissed.

The whole assets of the firm were turned over to Kempton, in pursuance of the agreement between Kempton and Kerchner, and he carried on the business on his own account, under the name of Sydney Kempton & Co.

*Mrs. Kempton was aware that this was the result of the settlement.*

Nothing further occurred until the latter part of May, 1876.

Kempton paid the extended notes which fell due in April. but when the time of maturity of the notes at six months approached, he announced his inability to meet them, and proposed that the creditors should extend the second and third notes, and give up the fourth altogether.

To induce them to accede to this proposition, Kempton made a false statement of his affairs.

When Kempton announced that he could not carry out the agreement of January 15th, 1876, Kerchner, in the exercise of the power reserved to him in that agreement, caused an examination of his affairs to be made by an accountant, and found that there was a deficiency in the assets turned over to Kempton in trust under that agreement, of $1953.73.

Kempton was totally without credit. No one would sell to him except for cash, he was living upon and consuming the trust property in his hands, and had announced that he could not carry out his agreement.

After the 29th of May, things went from bad to worse, and Kerchner discovered that Kempton was making way with the trust property.

Kerchner accordingly filed the bill in this case, on the 19th June, 1876, and it was proved in this case that between the 29th May, and June 15th, Kempton had appropriated $1329.12 of the trust money.

The bill seeks simply to protect the trust property by placing it in the hands of a receiver, and to prevent the removal or sale of the moveable property conveyed in the mortgage of indemnity, and prays for a sale of the mortgaged property upon the allegation of Kempton's inability to carry out the agreement of January 15th.

An injunction was issued as prayed, and Mr. Trippe appeared for both Kempton and Mrs. Kempton.

An agreement was entered into on the 6th of July, 1876, by Kempton, Kerchner, and the creditors of the old firm, for a settlement of the matters in controversy.

A decree was prepared in conformity with the agreement, on which the solicitors of the complainant and defendants endorsed their consent to its being passed, and it was accordingly passed on the 6th of July, 1876.

By the decree, among other things, it was decreed that the house should be sold by a trustee.

The agreement on which the decree was based, provided for the full release of Kempton from all liability for the debts of Kempton and Kerchner, and also released the furniture from the operation of the mortgage.

The property was sold by the trustee on the 24th August, 1876, and on the 11th September, 1876, Mrs. Kempton excepted to the ratification, assigning the following reasons therefor :

1st. That the consideration of the mortgage is not true as therein stated.

2nd. That the mortgage is void, because it was obtained by undue importunity of the husband of exceptant, with whom Kerchner conspired to procure said mortgage.

3rd. That the decree was passed before the condition of the mortgage was broken, and in the absence of the consent of the exceptant, or of any one authorized to represent her.

4th. That her husband had no authority to represent or act for her in the premises.

5th. That the condition of the mortgage had not been broken at the time of the decree, and that the filing of the bill and appointment of the receiver caused the default eventually.

Upon these exceptions proof was taken, and on the 17th day of May, 1877, the sale was set aside, and the exceptions ruled good and sustained for the reasons therein specified, and the decree for sale was annulled and set aside.

From this decree of the Court, sustaining the exceptions and setting aside the sale, the present appeal was taken.

The cause was argued before BARTOL, C. J., ALVEY, STEWART, MILLER, BRENT and BOWIE, J.

*Charles Marshall*, for appellant.

1st. With reference to the first exception, it is sufficient to say that it is not only not supported by any proof, but is shown to be entirely unfounded.

With reference to the second, which is the principal exception relied upon, we submit:

1st. That it is not shown that the mortgage was obtained by undue influence or threats of Kempton.

It will be observed that special exceptions are filed to part of the exceptant's testimony on this subject, but besides these exceptions, there is one point clearly established, and that is, that the mortgage in this case was not contemplated by any of the parties, until the day it was executed, namely, January 15th, 1877.

The proof of Trippe and Kerchner, on this subject, above referred to, is not contradicted, although the exceptant afterwards put Kempton on the stand.

It is shown conclusively that Kerchner's option to buy the business and its assets continued as long as until the 12th January, 1877. While that option continued, there was no occasion for Kempton to try to force his wife to make a mortgage, certainly no occasion disclosed by the proof. He was expecting the controversy to be closed by his partner buying out the business and indemnifying *him* against the debts.

It was not until January 15th, that Kempton proposed to buy out his partner, who had announced that he could not carry out his own proposition to buy out Kempton.

On the 15th, Kempton made his proposition, it was accepted, the papers were drawn, Kempton took the mortgage home for his wife to execute, and returned with it in the course of an hour or an hour and a half.

This would seem to dispose effectually of all the evidence of the exceptant about Kempton's persistent threats and

importunities extending over several weeks. That testimony cannot relate to *this* mortgage, which never existed, and which was never required by anything that took place before the 15th January, 1877, the day it was executed.

Certainly if Kempton was coercing his wife to execute this mortgage *some time before he had agreed to give it*, it must be apparent that Kerchner cannot be suspected of having anything to do with such conduct, as until January 15th, Kempton had not proposed to give a mortgage.

2nd. Not only does the above proof show that there was no compulsion used to obtain this mortgage, but the conduct of Mrs. Kempton herself shows that this whole case, so far as compulsion is concerned, is an after-thought, conceived or inspired after she had been disappointed in her efforts in another direction.

The first attempt was, to be admitted as creditor to share in the fund.

The next idea was to sue for damages, because the suit was brought before the notes had fallen due.

Her last resort was the plea of compulsion, which was suggested to her no doubt by reading the case of *Copeland and the Central Bank of Frederick.*

3rd. But even supposing that she did execute the mortgage under compulsion or threats, we submit that upon the evidence in this case, that fact does not affect the validity of the mortgage.

The mortgage is in fact a mortgage to the *creditors* of Kempton and Kerchner, and not to Kerchner in his own right, except as to the two notes for $400 each. *Boyd vs. Parker,* 43 *Md.,* 182.

But it is submitted that the decision below is based upon a misconception of the meaning of the decision of the Court in the case of *Copeland and Wife vs. The Central Bank of Frederick,* 18 *Md.,* 305.

In the present case, Kempton desired to purchase property that he considered valuable, and to procure an extension of the firm's debts for which he was liable.

Part of the consideration that he offered to his partner for the purchase of the business, and to his creditors for the extension of their claims without interest, was the execution of this mortgage.

Mrs. Kempton knew that fact.   Kempton offers to give the mortgage, his offer is accepted, both by his partner and his creditors, the property and business are transferred to him with his wife's knowledge, he keeps it from January to June, appropriates a large part of it improperly, some of it to the support of his family after he had been required to deliver up all to the receiver in this case, and after all that, the Court pronounces the mortgage void, restores the house to Mrs. Kempton, and leaves the deceived and defrauded creditors to shift for themselves.

Now, it is alleged in the exception, but the allegation is not attempted to be supported by proof, that Kerchner confederated with Kempton to procure the mortgage.   It is not even alleged that the creditors had any knowledge of the means by which the mortgage was obtained, as it is now pretended.

The case of *Comegys vs. Clarke & Comegys*, 44 *Md.*, 110, would seem to be conclusive on this question.

It is to be observed, moreover, that one of the objects of the suit which was settled by the arrangement of January 15th, 1876, of which the mortgage formed part, was to subject the mortgaged premises to the payment of these very debts.

By that settlement, the whole of the joint property of Kerchner & Kempton was interposed between the creditors of the firm and the house and furniture, and the claim of Kerchner to follow the partnership money into the house and furniture was abandoned, the house and furniture being relieved from all liability, except on the failure of Kempton to meet the mortgage notes.   It was not, therefore, as if Mrs. Kempton had mortgaged her separate property to secure her husband's creditors, (although that

would have been valid under the circumstances of this case,) but it was a settlement by which she quieted her own title, and relieved her property from a claim that might have deprived her of it altogether.

It is submitted, that when deeds or other instruments are procured from married women by fraud or compulsion, the legal consequences are in no wise different from those that follow in the case of any other person under like circumstances. It is only that married women are more exposed to fraud or undue influences than persons entirely *sui juris*, that makes the difference. But that only affects the *proof* of the fraud or undue influence, not its *effect* when proved—and it is submitted, that among the consequences of fraud or undue influence in the obtention of deeds, the rule that they are void in the hands of *bona fide* purchasers for value without notice, is not one. *Somer vs. Brewer*, 2 *Pick.*, 184, 201, 202, 203; *White vs. Graves*, 107 *Mass.*, 325.

We submit, therefore, that the decree or order which adjudges the mortgage to be void, is erroneous.

4th. It remains to consider whether the decree for sale should have been set aside.

We pass by the exception, that the filing of the bill and the appointment of a receiver, had the effect of breaking up Kempton's business, and preventing him from meeting the second set of notes.

It is shown, that the filing of the bill had become necessary to protect the trust fund in Kempton's hands, under the agreement of January 15th, 1876, which he had already violated, and the proof shows that the bill was not filed a day too soon.

Besides, Kempton had announced his inability to meet the notes before the bill was filed.

But it is said, Mrs. Kempton was not summoned, nor was she represented by counsel.

It is true she was not summoned.

It is also true, that Mr. Trippe did assume to represent her and act as counsel, and that in that capacity, he consented to the decree for sale.

It is not denied that Kempton requested Mr. Trippe to act as solicitor for Mrs. Kempton, but it is said that he had no authority to employ Trippe, and that she could not be bound by the employment of counsel, except by her own independent act.

We maintain, that in this State a husband may employ counsel to represent his wife in a litigation in which her separate property is concerned, and that in the absence of fraud or imposition, the same counsel may represent both.

The husband's authority may be shown by acts amounting to a ratification on her part.

In the absence of fraud or imposition, the wife will be bound by the act of counsel so appointed.

Her right to separate property, and to sue and be sued with reference to such property, carries with it of necessity, the right to have and the power to appoint counsel to represent her, and that right being assumed to exist, it may be exercised personally or through an agent, and its exercise may be proved by evidence that would be sufficient as to any other person.

Trippe was undoubtedly counsel for Mrs. Kempton in the first case, and was appointed by her husband. The appointment was fully recognized by Mrs. Kempton, when she swore to the answer prepared for her by Trippe, and signed by him as her solicitor. While that matter was pending, many messages passed between Mrs. Kempton and Mr. Trippe, as her counsel, the husband acting as the medium of communication.

When the second suit was instituted, Kempton employed Trippe to represent himself and wife, just as he had done in the first case. He brought instructions to Trippe from her, to get the furniture released from the mortgage, and Trippe did so and sent it to her at Mt. Holly Springs, according to her request.

The evidence of Mr. Trippe and the letters produced by him, show that he was acting as counsel of Mrs. Kempton with her assent.

It will also be noticed, that by the settlement, the creditors released Kempton, and allowed him to retain the money he had improperly diverted from the trust funds in his own hands, under the agreement of January 15th, 1876.

The mortgage contains an agreement on her part to consent to a decree, and, although the decree was passed before Kempton had actually made default in paying the second notes, the sale was not made until long afterwards. Mrs. Kempton was fully aware that the sale was to be made, and only asked to share as a creditor.

If the mortgage was valid, as we assume it to have been, it will not be pretended that Mrs. Kempton was prejudiced by the decree of sale.

The intervention of the receiver saved some part of the property that had to be applied to pay debts before coming on the house. In a little while, all the assets of Kerchner & Kempton would have been exhausted, and nothing would have been left but the house and furniture.

Under these circumstances, the agreement and decree of July 6th, were manifestly advantageous to Mrs. Kempton, and there is no reason why they should be set aside, having been assented to by counsel appointed by her husband, and recognized by her, and there being nothing in the decree itself which is in any respect prejudicial to Mrs. Kempton, or calling for the interposition of the Court for her protection.

*Geo. Hawkins Williams* and *H. J. Chilton,* for appellee.

1. The appellee insists that, even supposing that a mortgage so obtained could be valid for any purpose, yet if given to Kerchner as a security for her husband's business debts to him, she had a right to rely upon the busi-

ness succeeding so as to make a resort to the security unnecessary, and that, in no event, would *Kerchner* interfere with its success; but when Kerchner, from apprehensions merely as to its future, and prior to any default in fact, wilfully, by legal proceedings, causes the ruin of this business, he cannot be allowed in equity to compensate himself for the consequences of his own act at her expense.

Whether Kempton could or could not have met his latter payments as well and faithfully as his first, time alone could have determined. He thought he could; and whether he thought correctly or not is not the question.

The condition of the mortgage was that time should be given, and if Kerchner did not choose to wait, but would *entirely break Kempton up,* as Kempton states, in advance, and as he, Kerchner, admits, in his answer to the first cross-interrogatory, will a Court of equity allow him and help him to inflict the loss upon the innocent surety who can in no respect be complained of?

Kerchner first frustrates Kempton's exertions, works his ruin, and then seeks to make the wife's property reward him for his pains.

What a host of creditors may think would, *in their opinion,* have ultimately been the result, is foreign to the issue.

The mortgage stipulated for time, and time was not given.

It is submitted then that the fifth exception should be ruled good. *Story's Equity, secs.* 324, 325.

2. No creditor trusted the firm at her request, nor upon the faith of *her* property. She had paid for it with her own money, and her title was by deed of record, May, 1871, five years before the mortgage.

No creditor's debt existed four months prior to January, 1876; and whatever agreement Kerchner may, on behalf

of creditors and himself, have made, she was no party to it; never was consulted even about it. They have therefore no equity for a resort to it outside of the paper itself.

The debt had already been contracted when the mortgage was extorted, and what was thus wrung from her was a security for pre-existing debts with no advantage; no new consideration moving to her; and with no detriment to creditors. No equitable considerations disable her from repudiating it; and the taint upon it as it left her hands, yet exists upon it.

3. The third and fourth exceptions should be ruled also good; for, if a husband can, by *his* assent, bind a wife's separate estate; or his attorney bind her by *his* direction; or her interests can in any manner be affected, even under color of judicial proceedings, by acts in which she does not participate, and with no service of process upon her, then there no longer exists a separate estate for a married woman in property. The sheriff returned her *non est*, and in fact she was then living, as the proof shows, at her home in Mount Holly, Pennsylvania.

4. But, it is submitted, the second exception completely disposes of the case.

The proof as to her physical condition and the manner in which the mortgage was obtained is positive, clear, and not attempted to be contradicted. It presents a state of case far beyond that in *Central Bank of Fred'k vs. Copeland*, 18 *Md.*, 305; *Whitridge vs. Barry*, 42 *Md.*, 110.

These authorities are so conclusive as to make all comment needless.

If knowing how to read and write, and with every opportunity to ascertain what the paper was before executing it, and in a condition of *perfect free agency* she had executed and acknowledged it, then, as was said in *Comegys vs. Clarke*, 44 *Md.*, 110, the wife would be bound.

But, as that case also says, if threats or intimidation to compel execution had been used, then it would have come

within the principle of *Central Bank of Fred'k vs. Cope-land*, 18 *Md.*, 305, and the mortgage would be good for nothing.

For these reasons, it is submitted, the order appealed from should be affirmed.

Bowie, J., delivered the opinion of the Court.

The Circuit Court of Baltimore City by its decree, dated the 17th of May, 1877, adjudged and decreed "that the exceptions to the ratification of the sale filed by the next friend of Rebecca Kempton, be ruled good and sustained for the reasons and cause therein specified." It further decreed, that the *sale* therein reported be set aside, and "*the decree for the sale thereof under which the same was professed to have been made, is thereby annulled and set aside with costs.*"

From this decree the complainant below appealed. Although in form exceptions to the ratification of the sale, the objections of the appellee are in fact allegations impeaching the mortgage on which the bill was filed, and the agreement and all the intermediate proceedings by which the decree was obtained, as being conducted without the knowledge, privity and consent of the exceptant, concluding with a prayer, that the sale be set aside, and the decree rescinded and annulled.

The decree for sale was passed on the 6th of July, 1876;—the sale reported on the 25th of August;—an order of ratification *nisi* passed on the same day, and the exceptions filed on the 11th of September, 1876.

These are substantially as follows, viz.,

1st. Because the consideration recited in the mortgage is not true as therein stated.

2nd. Because the execution of the mortgage by the exceptant was procured by the undue importunity of her husband, which she was too weak to resist; the complainant confederating with the husband, with full knowledge

of her condition, to procure the same, and intending fraudulently to deprive her of her property.

3rd. Because the mortgage had not become forfeited, the debts which it was designed to secure not being due at the time of the passage of the decree.

4th. That the exceptant had no notice of the proceedings in the cause until shortly before the sale, and all papers in the cause assenting to the proceedings *were without* her *knowledge and authority*, and directed to be signed solely and exclusively by her husband, who is alone responsible therefor. Whereupon she prayed leave to dissent from all that was done under her name, and that the sale may be set aside, decree rescinded, and the said mortgage be declared null and void.

The mortgage dated the 15th of January, 1876, from Rebecca C. Kempton and Sydney Kempton, her husband, of Baltimore City, etc., recites, " whereas the said Sydney Kempton has agreed to pay the indebtedness of the co-partnership lately existing between him and Ferdinand Kerchner, and to discharge the said Kerchner from all liability for the same, said payments to be made in equal instalments, at *three, six, nine* and *twelve* months, etc., and whereas, the said Sydney Kempton has further agreed to pay the said Kerchner the sum of eight hundred dollars in two equal sums of four hundred dollars each, in *four* and *eight* months, according to his promissory notes of that date, given said Kerchner to that effect," in consideration of the premises, and of the sum of one dollar, the said Rebecca C. Kempton and Sydney Kempton, granted to the said Kerchner all that lot of ground therein described, situate in the City of Baltimore, being the same piece of ground which by indenture dated the 24th of May, 1871, was conveyed by Ammon Cate to said *Rebecca C. Kempton,* etc.

After the usual provisoes, that upon payment of the debts intended to be secured, etc:, the mortgage should be

void, and until default the mortgagors should retain pos-session, the mortgagors in the event of failure to pay the notes, etc., assented to the passing of a decree by the Cir-cuit Court of Baltimore City for a sale of the property thereby mortgaged, pursuant to the provisions of the Code of Public Local Laws, Article 4, secs. 782 to 792 inclusive, and the additional sections therein mentioned and referred to, to be made by the said mortgagee or his attorney, etc.

The mortgagee, Kerchner, filed his bill in the Circuit Court of Baltimore City, on the 19th of June, 1876, against the mortgagors, alleging that Sydney Kempton and the complainant had been engaged as partners in the manufacture of leather, sometime previous to the year 1875, and in that year discovering that Kempton had withdrawn from the firm money belonging to it, *chiefly for the purpose of purchasing and furnishing a house in the city, the title of which he had caused to be conveyed to his wife, etc., he had filed in said Court,* a bill against said Sydney Kempton and wife, praying the dissolution of the firm, the appointment of a receiver, and to have the money so invested in the house and furniture brought back into the firm for the payment of its debts by having said house and furniture sold for that purpose.

That an agreement was made between the complainant Kerchner and Sydney Kempton, and another between said Kempton and the creditors of the firm of Kerchner & Kempton, (by which the said suit was terminated,) which agreements were parts of the settlement between himself and Kempton of said litigation.

By the agreement between himself and Kempton, Kerchner assigned to Kempton all his right and interest in the property and business of Kerchner & Kempton, and Kempton agreed to pay all the debts of the firm and indemnify the complainant, and Kempton agreed to procure a mortgage to be executed by himself and wife of the house and lot referred to, and to give him a bond with surety,

which mortgage and bond were to secure the covenants of indemnity. The bill further charged that Kempton had violated the agreements entered into by him with the complainant, and the creditors of the firm; that he was wasting the assets of the firm assigned to him; had not paid the creditors as agreed; that the whole amount of property remaining in Kempton's possession was insufficient for the indemnity of the complainant, wherefore the complainant prayed that a decree be passed directing the sale of the trust property in the hands of Kempton, and the collection of the trust assets and the sale of the mortgaged premises by a trustee to be appointed by the Court, and the application of the proceeds of the sales according to the trusts declared as to the same, etc. The bill prayed the appointment of a receiver to take charge of the property in the meantime, that the defendants, Kempton and wife be enjoined from interfering with the property, and that they be summoned to show cause why the complainant should not have relief as prayed.

On the 20th June, an order for the appointment of a. receiver and the issuing of an injunction was passed. The injunction was returned "*served*" on Sydney Kempton; "*non est*" as to Rebecca; and the *subpœnas* were returned *served* as to the *former*, "*non est*" as to the latter.

On the 6th of July, a paper was filed in the cause entitled "Agreement for Decree," signed by the complainant, and Sydney Kempton, and several creditors of the firm under their hands and seals, and endorsed:

" We hereby assent to the passage of the within decree."
Subscribed.            Chas. Marshall, *Sol'r for compl't.*
                 A. C. Trippe, *Sol'r for defen'ts.*"

This agreement contained among other clauses, the following:

" It is further agreed that the house known as No. 397 Druid Hill Avenue, described in the mortgage from

Sydney Kempton and wife to said Kerchner, dated January 15th, 1876, and filed with the bill, *shall forthwith be decreed* to be sold by a trustee to be appointed by a decree in this case, and the proceeds applied to the uses and trusts declared as to the same in said mortgage, and to the payment of the debts secured thereby.''

'' It is further agreed that the furniture mentioned in said mortgage shall not be sold, but that the same shall be and remain exempt from the operation of said mortgage.''

It was also agreed that all the creditors of the late firm of Kempton & Kerchner, as the same were on the 15th of January, 1876, shall accept this agreement in full satisfaction of their respective claims against the said firm, and '' in consideration of the said agreement and its execution in good faith,'' they released and discharged the said Sydney Kempton and Ferdinand Kerchner from all demands against said firm.

Said Kerchner agreed in like manner, etc., to release his claim against Kempton, and to release the mortgage above referred to, '' so far as it covers the furniture therein mentioned, and to release all claims he may have, and dismiss any suit he may have brought against any of the parties thereto.''

The Court on the 6th July, 1876, by its decree passed '' *by agreement of parties filed in the cause, (and without deciding anything as to the allegations of the bill, with reference to the alleged misuse or misappropriation by the defendant Sydney Kempton of the property referred to in the bill and exhibits, as to which parts of the bill no decision is given or asked by the parties,) and upon the agreement of the respective solicitors of the parties thereto annexed,*'' appointed a receiver and trustee, and directed the house and lot to be sold, etc.

The trustee sold the same for $4150, and reported the same to the Court, on the 25th of August, 1876. Whereupon the usual order of ratification *nisi* was passed, when the appellee filed her exceptions.

It is apparent from the preceding statement of the case, that the decree being passed avowedly upon "*the agreement of the parties filed in the case*," and "*upon the agreement of the respective solicitors of the parties*" thereto annexed, the validity of the decree as far as it affects the appellee, depends entirely upon the authority of the solicitor to enter into such agreement on behalf of the appellee. The agreement of *the parties* referred to in the decree, was an agreement between Kerchner, Kempton, and certain persons who were creditors of Kerchner & Kempton ; the agreement of the respective solicitors of the parties, thereto annexed, is subscribed generally "solicitor for complainant," "solicitor for defendants," intended doubtless to represent Sydney Kempton and Rebecca C. Kempton, defendants named in the bill.

This agreement was obviously designed to operate as an answer, admitting all the allegations of the bill, and consenting to the decree as far as the parties to the cause were concerned, besides effecting a compromise or settlement between the firm of Kerchner & Kempton, and their creditors.

Mrs. Kempton is not named in the agreement as a party, or asked to subscribe it, although her separate property is the principal subject to be affected by it, and the main object of the negotiation between the contracting parties.

This agreement, not being executed by the wife conjointly with her husband, cannot bind her separate estate as such ; nor can it bind the appellee as an answer.

The case of *Griffith vs. Clarke*, 18 *Md.*, 457, 463, cited by the appellant, (as far as cases in equity are involved,) does not sustain the position that in this State a husband may employ counsel to represent his wife in a litigation in which her separate property is concerned, and that in the absence of fraud or imposition the same counsel may represent both.

The judgment, the execution of which was enjoined in that case, was rendered against husband and wife as joint makers of a note, by default. There was no appearance for either.

This Court, speaking of that judgment said, "the principle that a party cannot impeach a judgment on any ground which might have been pleaded or relied on below as a defence to the suit, does not apply to a case like this, where the defendant is a *feme covert*, and not ' *sui juris.*' Persons in the condition of the appellee, are not competent to employ an attorney."

"If she had appeared in the suit at law by attorney employed by her husband, and her coverture had been pleaded in defence to the action, the Court would have allowed the plea. But the question here is whether the defendant being sued at law on a personal contract, altogether void at law, is to be prejudiced by the entry of a judgment by default against her, for non-appearance. In our opinion, such a judgment is merely void."

It is said in *Brown vs. Kemper*, 27 *Md.*, 673, that a judgment against the wife " *in invitum*," jointly with her husband, for a tort committed by her, will bind her and her property, but a judgment in an action " *ex contractu* " founded on a cause of action which she was not legally competent to make, can have no such effect.

If husband and wife are sued at law, the husband is to make an attorney for her. 2 *Sand.*, 213 ; 6 *Mod. R.*, 86 ; 3 *Taunt.*, 261, for a *feme covert* cannot make an attorney.

As a general rule when husband and wife are sued jointly in equity, the *feme covert* answers with her husband, but under special circumstances she may put in a separate answer. *Stor. Eq. Pleading, sec.* 873 : but she is presumed to be so far under the dominion of her husband, that she is not bound by her answer made jointly with him. *Alex. Prac.*, p. 84, *note x ; Warner, et al. vs. Dove and Wife*, 33 *Md.*, 584.

According to the English authorities, where husband and wife are made defendants to a suit in chancery, relating to personal property belonging to the wife, and they put in a joint answer, such answer may be read against them for the purpose of fixing them with the admissions contained in it, but, where the subject-matter relates *to the inheritance of the wife*, it cannot, and the facts relied on must be proved against them by other evidence. *Vide Evans vs. Cogan*, 2 *Peere Wms.*, 449; *Merest vs. Hodgson*, 9 *Pri.*, 563; *Elston vs. Wood*, 2 *M. & K.*, 678; 1 *Dan'l Ch. Pr.*; also *Lingan vs. Henderson*, 1 *Bland*, 236.

In the case of *Lyles vs. Hatton*, 6 *G. & J.*, 122, it was held that in a case against husband and wife in relation to a fund which comes to her in course of distribution, she should be compelled to answer, or some reason should appear on the record for not doing it, before a decree should be passed.

If the decree in this case had been passed in a cause between parties, "*sui juris*," represented by counsel and regularly submitted on bill and answer, its legal effect would have been to establish "*inter partes*" every fact necessary to the passage of the decree; but being passed by agreement of counsel whose authority to act for one of the defendants is denied, and is now the subject of inquiry, in a cause in which the defendant supposed to be represented is a *feme covert*, and was returned "*non est*," no presumption can arise not warranted by the evidence.

The primary question therefore is, was the agreement of counsel submitting the case for a decree, an act which binds the appellee. We have shown, we think, she was not bound by the agreement as the answer of her husband, or the joint answer of her husband and herself, if it had purported to be such.

The solicitor signing the "agreement for decree" on behalf of the defendants, deposes he did not know Mrs.

Kempton, never had any communication with her, except through her husband. The only evidence of the retainer of the solicitor by the appellee, is the presumption arising from the signing and swearing by her *to an answer in a previous suit,* and the execution of the mortgage in question, prepared by the solicitor.

The appellee testifies she had no counsel, never consulted with any lawyer; and referring to the answer in the other case, which was shown to her says, " I don't remember anything about this ; I signed two papers : I remember one was the mortgage, but I don't remember Mr. Kempton telling me what this paper was, being in a sick condition, and so nervous I didn't know what I was doing : I went before the magistrate and swore to the paper."

Kempton, her husband, deposes his wife had no knowledge of the " agreement for the decree." There is no evidence of express authority being given by the appellee to the solicitor to represent her, and none from which such authority could be reasonably implied.

The act of the solicitor, so far as he undertook to represent the appellee, in signing the " agreement for decree," must be considered unauthorized. In whatever aspect the " agreement" is viewed, whether as a contract affecting the real estate of the appellee, or an answer admitting the allegations of the bill, and consenting to the sale, it has none of the sanctions necessary to bind a *feme covert* defendant, as to her separate real estate.

A decree for the sale of real estate, passed without appearance of the defendant, or default made, and without consent, or proof under a commission, interlocutory, or otherwise, must necessarily be null and void.

It is assumed in the brief of the appellant, that the Court below, having adjudged that the exceptions to the ratification of the sale be ruled good, for the reasons and cause therein assigned, *all the propositions contained in*

*the exceptions are judicially established,* and he proceeds to argue, and overcome them *seriatim;* but, the decree sustaining the exceptions, does not declare the mortgage void, but sets aside the sale, and annuls the decree under which it was made. The reasons assigned for the decree, are no part of the decree. In affirming the one, we do not necessarily adopt the other.

The decree of the Court below, setting aside the sale, and the decree under which the sale was made, will be affirmed with costs and cause remanded.

*Affirmed and remanded.*

(Decided March 1st, 1878.)