Linnenkemper, Assignee, &c. vs. Kempton.

(Decided 13th March, 1882.)

---

HENRY LINNENKEMPER, Assignee, &c. *vs.* SIDNEY KEMPTON, and REBECCA C. KEMPTON, by her next friend SAMUEL A. CLAGETT.

*Duress—Undue influence—Husband and wife.*

To set aside a deed made by a married woman, on the ground of duress or undue influence, where it appears from the proof that she was a lady of good intelligence and capacity, in full possession of her mental faculties, and the deed shows upon its face that she appeared with her husband before a justice of the peace, and solemnly acknowledged it to be her act, requires the clearest and most satisfactory evidence.

APPEAL from the Circuit Court of Baltimore City.

The case is stated in the opinion of the Court.

In the Court below, (DOBBIN, J.,) delivered the following opinion:

"In this case the plaintiff obtained an *ex parte* decree for the sale of mortgaged premises, under which the same have been sold, and the sale has been reported to this Court for ratification. Rebecca C. Kempton, the wife of the mortgagor, with whom she united in the mortgage, now excepts to the ratification of the sale upon two grounds:

"1st. That she was coerced into the execution of the mortgage by acts of her husband, which deprived her of her free will, she being then in such bodily and mental condition as prevented her from resistance; and—

"2nd, That Kerchner, the mortgagee, deprived her husband by certain legal proceedings against him, of the power to fulfil the conditions of the mortgage, and therefore cannot equitably take advantage of the breach of them.

"To the first of these exceptions, the plaintiff contends that it is not true in point of fact; and to the second, that it is not maintainable in point of law.

"Upon a very careful review of all the evidence, I am of opinion that the first exception is fully sustained. There is no directly conflicting evidence upon the subject of Mrs. Kempton's feeble condition of health, and no direct impeachment attempted of the witnesses who have testified to it, and to the coercive acts of her husband, but reliance has mainly been placed upon the fact that the mortgage, upon which the decree was obtained, was proposed as part of an arrangement made only a few hours before its execution, whilst the witnesses testify to coercive acts proceeding through several weeks previously, and which could not therefore relate to an instrument not thought of before its actual execution. This argument most forcibly presented and argued by counsel, is fully answered by a recurrence to the events which took place in the interval between Kerchner's first bill in chancery, and the date of the mortgage. In that bill filed on the 10th of December, 1875, Kerchner alleged that this mortgage property had been bought with the partnership funds of Kerchner & Kempton, and at that date commenced the troubles of the firm, and of Mrs. Kempton, in connection therewith, she having been made a defendant in the suit. It is also in proof that Kerchner, prior to this, urged Kempton to get his wife to mortgage this

property in order to bring more capital into the concern; that Kempton was in a state of great trouble and excitement growing out of the disturbed state of affairs, and that this subject was painfully and anxiously discussed between his wife and himself. It is to these conversations and acts then the witnesses refer, and if the result of them was to bring Mrs. Kempton into subjection to his will, with reference to the subject of yielding up her property to the uses of her husband and his business, then they reflect themselves upon this particular mortgage as much as if they took place in connection with it alone. This is explicitly decided in 18 *Md.*, 318. I think, therefore, that the facts relied upon in the first exception, are sustained by the proof.

"But the plaintiff contends that Kerchner and the creditors of Kerchner & Kempton, are *bona fide* purchasers without notice, and are therefore entitled to be protected in this deed. If Copeland, in the case in 18 *Md.*, was to be considered the agent of Thomas & McPherson, and bound by his knowledge, how much more should that be held to apply to Kerchner. He knew that this was Mrs. Kempton's property, purchased with her own money. He knew that she refused to bring it into the firm's affairs, because he had filed a bill against her to coerce her to do so, to which she had filed an answer so refusing, and he knew that she had been 'worrying' over the proposed settlement.

"Now, are the creditors in any better condition than Kerchner himself? The mortgage was made to him, and they have no claim except such as may be worked out through him, and their title can be no better than his.

"Upon the second exception, I am of opinion that there is no force in it. The mortgage stipulated for the payment of two notes, and of the creditors of Kerchner & Kempton, and the payment of the rent of their warehouse, but it made part only of an agreement made at the same

time, by which Kempton agreed to do several other things. If Kempton failed to perform any of these things, Kerchner had of course a right to enforce their performance by suit, which is precisely what he did. If the result of that suit was to impair Kempton's credit to the extent of preventing him from complying with the conditions of the mortgage, it is a result which he has brought upon himself, and of which he has no right to complain. There was no implied obligation on the part of Kerchner to raise or suspend his right to have the agreement performed, because enforcing it might injuriously affect Kempton's credit.

"For the reasons given under the first exception, I must withdraw my assent to the ratification of the sale, and will pass such order as will dispose of the case."

From the decree passed in accordance with this opinion, setting the sale aside, and declaring the mortgage proceedings void, the complainant appealed.

The cause was argued before BARTOL, C. J., MILLER, ROBINSON, IRVING and RITCHIE, J.

*J. Upshur Dennis*, and *Charles Marshall*, for the appellant.

The threat, and compulsion, were not of a character to invalidate the deed. The only threat was that Kempton would take *his own life;* a threat to furnish sufficient ground for invalidating a deed, must be one *directed against the party who is to sign,* and even the threat of a husband to take his own life, although believed in by the wife, will not relieve her from liability under her deed. *Wright vs. Remington,* 41 *N. J.,* (*Law Rep.,*) 52, 53; *Pollock on Contracts, sec.* 520.

Except this threat, the rest of the "compulsion" consisted only of urging and importunities; and of course is insufficient to invalidate a deed.

Linnenkemper, Assignee, &c. *vs.* Kempton.

A deed obtained by threats, undue influence, importunities and the like, is not void, but *voidable* only, and will not be set aside against *bona fide* purchasers for valuable consideration, and without notice of, or participation in, the wrong. *Pollock on Contracts, sec.* 520; *Somes vs. Brewer*, 2 *Pick.*, 183, 201, 202, 203; *White vs. Graves*, 107 *Mass.*, 325; *Comegys vs. Clark*, 44 *Md.*, 110.

In this case, Kerchner, was such purchaser. The mortgage was not to secure a past debt due by Kempton to him, but part of the consideration offered by Kempton to his partner for the purchase of the business, and to his creditors for the extension of their claims without interest.

There was not a particle of proof that Kerchner confederated with Kempton to procure the mortgage, or that Kempton was in any way the former's agent to procure it. The uncontradicted testimony of Trippe, Jenkins and Kerchner is, that the proposition to give the mortgage came from Kempton himself as part of an arrangement he proposed whereby to buy out the business.

These facts wholly distinguish the case from *Central Bank of Frederick vs. Copeland, et al.*, 18 *Md.*, 305, which was the case of a mortgage by the wife directly to the creditor of the husband to secure a past due debt of the husband, with no new consideration operating, and where the Court found the husband was acting as agent of the mortgagee in the procurement of the mortgage.

This mortgage was, in fact, a mortgage to the *creditors* of Kerchner & Kempton, and not to Kerchner in his own right, except as to the two notes of $400 each. *Boyd vs. Parker*, 43 *Md.*, 182.

*Geo. Hawkins Williams*, for the appellees.

The title to this house could not pass without a full legal consent of the wife. Bullying and terrorism and other threats accomplished in her case this iniquitous mortgage. No one could validly set up such an instru-

ment, especially the promoter of the husband's conduct, and those who had never become creditors on the faith of this property being in any manner liable for their security, and who trusted the firm without regard to or knowledge of it. *First Nat. Bk. vs. Eccleston,* 48 *Md.,* 160; *Whitridge vs. Barry,* 42 *Md.,* 140; *Eadie vs. Slimmon,* 26 *N. Y.,* 9; *Central Bk. of Frederick vs. Copeland,* 18 *Md.,* 305; *Comegys & Co. vs. Clark, et al.,* 44 *Md.,* 109.

The second exception is not before the Court, but if it hereafter should be of any consequence, it is submitted that Kerchner's filing a bill and breaking up the husband's business prior to any default, incapacitates him and all claiming under him in a Court of equity from any profit arising out of his perfidious act.

BARTOL, C. J., delivered the opinion of the Court:

This is an appeal from the decree of the Circuit Court of Baltimore City, setting aside a sale made by a trustee under a decree passed upon petition of the appellant, in pursuance of the terms of a mortgage of Kempton and wife to Kerchner, dated January 15th 1876, exhibited with the petition. The decree from which the appeal was taken also declared the mortgage to be void.

Kerchner, the mortgagee, having become bankrupt, the appellant was duly appointed his assignee, and in that character, instituted these proceedings for the purpose of enforcing the mortgage.

The property embraced in the mortgage was the separate property of Mrs. Kempton.

Two exceptions to the ratification of the sale, and which also impeached the validity of the mortgage, were filed by the appellees; as briefly stated in the opinion of the Judge of the Circuit Court, they are as follows:

1st. "That Mrs. Kempton was coerced into the execution of the mortgage by acts of her husband which deprived her of her free will, she being then in such

bodily and mental condition as prevented her from resistance."

2nd. "That Kerchner, the mortgagee, deprived her husband by certain legal proceedings against him, of the power to fulfil the condition of the mortgage, and therefore cannot equitably take advantage of the breach of them."

The *second* exception was overruled by the learned Judge of the Circuit Court; but being of opinion that the first was supported by the proof, he decreed the mortgage to be void and set the sale aside.

Most of the material facts and transactions which preceded the execution of the mortgage, as well as those which followed, are set out in the case of *Kerchner vs. Kempton*, 47 *Md.*, 568, and need not be repeated here.

By the agreement of the solicitors contained in this record, "all the record containing the documentary evidence, and the evidence taken under the commission in the case of *Kerchner vs. Kempton*, may be used, and to have the same effect as if taken under a commission in this cause, so far as either party may deem the same to be applicable, and subject to all just exceptions, with leave to either party to take such other testimony as may be admissible."

In *Kerchner vs. Kempton*, 47 *Md.*, 568, the appeal was from an order setting aside a sale made under a decree which purported to have been passed *by agreement of the parties*. The agreement referred to was entered into by Kerchner & Kempton, and their respective solicitors, and also by the creditors of the firm of Kerchner & Kempton. Mrs. Kempton was not a party thereto, and it did not appear that *Mr. Trippe*, who was acting as solicitor for Kempton, had been employed by Mrs. Kempton, or was authorized to represent her as counsel, and for that reason, as it appears from the opinion of this Court, 47 *Md.*, 591, the order setting aside the sale and annulling the decree

under which it was made was affirmed. In that case, the exceptions to the sale not only impeached the validity of the decree for the reason above stated, but also assailed the mortgage as invalid, upon the same grounds as are now urged in the present case; but this Court did not express any opinion thereon, although the same testimony now relied on was then produced for the purpose of proving the alleged duress and coercion upon Mrs. Kempton by her husband, whereby it was charged she had been deprived of her free will, and induced to execute the mortgage.

We have examined that testimony most carefully, as well as that taken under the commission in this case, and have reached a different conclusion from that expressed by the learned Judge of the Circuit Court; and are of opinion the alleged duress, or undue influence coercing Mrs. Kempton to execute the mortgage in question, has not been satisfactorily established by the testimony. It appears from the proof that she was a lady of good intelligence, in full possession of her mental faculties. The instrument shows upon its face that she appeared with her husband before a justice of the peace, and solemnly acknowledged the same to be her act. To set aside a solemn deed of this kind upon the grounds here alleged requires the clearest and most satisfactory evidence.

To judge of the weight of the evidence here relied on, it is necessary to advert briefly to the circumstances which preceded the execution of the mortgage and those immediately attending the transaction.

Kerchner and Kempton were co-partners in business till the latter part of the year 1875, when the former filed a bill praying for a dissolution of the partnership and the appointment of a receiver, charging a misappropriation by Kempton of the partnership funds, and among other things, specially charging that the money of the firm had been used by Kempton in the purchase of a house and

Linnenkemper, Assignee, &c. *vs.* Kempton.

lot, with the furniture therein, which had been conveyed to his wife and was held in her name. Mrs. Kempton was made a party defendant, appeared and answered the bill separately under oath.

At that stage of the case, negotiations for a settlement were begun between the parties. Kerchner offered to buy out Kempton, and an agreement to that effect was made December 28th, 1875 by which Kerchner agreed to pay for the assets and business of the firm $975, (of which $175 was to be paid in cash, and the balance to be secured by note) and to indemnify Kempton against its debts. Kerchner had *five days* within which to perform this contract; the time was afterwards extended for ten days longer, which ended on the 12th day of January 1876. That arrangement having fallen through, three days thereafter Kempton made a proposition to buy out the concern. According to the evidence this proposition was made for *the first time on the 15th day of January* 1876, *about half past one o'clock.* It was accepted; on the same day the papers were prepared and signed, one of them being the agreement between Kempton and Kerchner, containing the terms of their contract, and among other things providing for the execution of the mortgage in question; the other paper being an agreement of the creditors assenting to the arrangement and granting an extension of time for paying their debts. The mortgage was also then prepared, was taken by Kempton to his *home,* executed by him and his wife, and recorded at 4½ o'clock, p. m. on the same day. The fact that the mortgage in question was not in contemplation of any of the parties before the 15th day of January 1876, and that the whole transaction was begun and completed within the short space of time mentioned, entirely precludes the idea that the execution of the instrument by Mrs. Kempton was procured by means of the long continued exercise of coercion and persecution by her husband deposed to by the witnesses.

Besides Mrs. Kempton herself, the witnesses who testified
on this subject are her daughter *Clara,* her sister *Mrs.
Mundorf,* and her brother-in-law *Samuel C. Kempton;*
all of them testified that Kempton importuned his wife
for a considerable time to sign a mortgage, and to induce
her to comply with his wishes threatened to take his own
life—or to abandon her if she refused. According to the
testimony of these witnesses and of Mrs. Kempton herself,
these importunities and threats had continued for several
weeks. The testimony further shows that she persistently
refused to comply with his request. It is evident from the
whole testimony in the case, that the mortgage of Janu-
ary 15th is not, and could not have been the mortgage in
relation to which these witnesses testified. There is evi-
dence in the case that there had been some talk between
Kempton and Kerchner before any controversy had arisen
between them, about Kempton getting the house mort-
gaged to put more money in the business; this appears
from the testimony in chief of Samuel C. Kempton, and
all the circumstances indicate that the mortgage which
Kempton had so long importuned his wife to sign was a
mortgage for that purpose, and not the mortgage now in
question.

By the arrangement made on the 15th day of January
1876, Kempton secured the purchase from Kerchner of
the assets and business of the firm for $175 in cash and
his two promissory notes of $400 each, payable in four
and eight months, and from the creditors he secured an
extension of time for the payment of the debts of the
firm for periods of three, six, nine and twelve months.
To secure the fulfillment of his engagements to Kerchner
and the creditors, it was agreed that the mortgage should
be executed. It is evident from all the facts and circum-
stances that in the estimation of Kempton the arrange-
ment was one eminently desirable for him, and which
promised to secure to him a lucrative and profitable busi-

ness. Mrs. Kempton says in her testimony (fifth cross-inter.) "that she was aware that by the settlement of the first suit Mr. Kerchner left the business, and that the whole of it passed into the hands of her husband."

Considering all the facts as they then existed, there was no reason why she should hesitate to concur in the arrangement. The promptness with which she united with her husband in executing the mortgage, which then, for the first time, had been proposed or called to her attention, is a significant fact to show that no coercion or importunity on the part of her husband was necessary.

We have been constrained to reach the conclusion that the defence of coercion and duress was an after-thought. Nothing of that sort was heard of till long after the transaction. On the 19th day of June 1876, Kerchner filed a bill charging Kempton with wasting and misapplying the trust funds in his hands; on the 6th day of July following, the agreement was made to which we have referred, by which that controversy was settled, and under which the decree of July 6th 1876, was passed. Under that agreement, all the furniture in the house which had been included in the mortgage was released, and Mrs. Kempton took the same into her possession and moved to Pennsylvania. While there, she claimed to be entitled as a creditor of the firm, to participate in the fund, as is shown by her letter to George C. Jenkins, the trustee, dated July 10th 1876.

Mr. Trippe testified that "the question of undue influence was never suggested to him during his connection with the case," which continued till the settlement of July 1876. The first intimation in the record of that defence appears in the exceptions to the ratification of the sale filed on the 11th day of September 1876, eight months after the mortgage was executed.

Under the commission issued in the present case, Sydney Kempton was examined on the 3rd day of February 1881,

and stated that he "coerced his wife to sign the mortgage," that he "threatened to commit suicide for one thing—abandonment;" told her "she would have to sign it," &c., and added, "*when* I look back and think of it, I am very much surprised at the way I acted.".

In his answer to the 14th interrogatory he says, "I persuaded her a great many times, in fact it was the principal conversation between myself and her, for at least two or three weeks; she cried and went on at a great rate, and did not want to sign the mortgage. I told her she would have to do it, that I hadn't any money to go to market with."

This testimony is remarkable, especially when it is considered that the witness is speaking of the mortgage of January 15th 1876, which had never been contemplated or proposed till the day when it was prepared and executed; and it is still more remarkable that the same witness, when he was examined on the 31st day of January 1877, in the case, of *Kerchner vs. Kempton,* in which the mortgage had been impeached as invalid, and the same issue was involved, said not one word about having used any importunity, coercion or threats to induce his wife to execute the paper.

There is no doubt that in the interval of time between the filing of the first bill by Kerchner, on the 10th day of December 1875, and the amicable settlement of that suit, on the 15th day of January following, Kempton was in a state of great pecuniary embarrassment and trouble, and the condition of his affairs was doubtless a subject of anxious discussion between himself and his wife; and the scenes to which the witnesses refer, evidently occurred during that period; when his importunities to induce his wife to unite with him in mortgaging her property for his benefit, spoken of by the witnesses, took place. And it is a significant fact, that during that period she had persistently refused to yield to his importunities.

Linnenkemper, Assignee, &c. *vs.* Kempton.

The settlement of January 15th 1876, put a new face on his affairs, the distressing law suit was compromised, and settled,—the indulgence of the creditors had been obtained, and the opportunity was afforded to Kempton to continue the business on his own account, with a fair prospect of pecuniary profit and success. The house and furniture which had been claimed as belonging to, and equitably constituting part of the assets of, the firm, were released from that claim, and as the acknowledged property of Mrs. Kempton were merely pledged for the faithful performance of her husband's engagements.

Whatever may have been the cruel and unmanly conduct of Kempton towards his wife, and his persistent efforts to coerce her into a compliance with his wishes for the accomplishment of his previous plans and purposes, it is clear that those importunities had no reference to the mortgage of January 15th 1876, and had no influence in inducing her to execute it.

Without extending this opinion further, we remark as our conclusion upon the whole case that the attempt to impeach the mortgage in question on the ground of coercion and duress, has not been supported by the evidence.

With respect to the *second* exception to the sale, before stated, we fully concur in the opinion expressed by the Judge of the Circuit Court, and for the reason stated by him, think it was properly overruled. But differing from him on the *first* exception, the decree below will be reversed and the cause remanded, to the end that the sale may be ratified and further proceedings had in the case.

*Reversed and remanded.*

(Decided 22nd March, 1882.)